Roger George FLITTIE, Appellant,

v.

Herman SOLEM, Warden, South Dakota State Penitentiary; and Mark V. Meierhenry, Attorney General, State of South Dakota, Appellees.

No. 84–1248.

United States Court of Appeals, Eighth Circuit.

Submitted June 15, 1984.

Decided Jan. 11, 1985.

Heaney, Circuit Judge, filed dissenting opinion.

David R. Gienapp, Arneson, Issenhuth & Gienapp, Madison, S.D., for appellant.

Mark V. Meierhenry, Atty. Gen., Jeffrey P. Hallem, Asst. Atty. Gen., Pierre, S.D., for appellees.

Before HEANEY and JOHN R. GIBSON, Circuit Judges, and COLLINSON,* Senior District Judge.

JOHN R. GIBSON, Circuit Judge.

Ruth Flittie was found dead, with multiple head injuries, having been beaten with the base of a lamp that was found by her body. Her adopted son, Roger Flittie, was convicted of conspiracy to commit murder but acquitted of the charge of murder. A second trial followed, based on the events surrounding the same killing, and Flittie was convicted as an accessory after the fact to murder. Flittie brought this habeas corpus petition under 28 U.S.C. § 2254 (1982), alleging that his conviction of conspiracy to commit murder and acquittal of murder barred his trial on the accessory charge under double jeopardy and collateral estoppel theories. He further argues that a videotape recording of a discussion between him and a government informer violated his constitutional rights. Having carefully considered these and other arguments that he makes, we affirm the judgment of the district court.[1]

The original information charged Flittie and Tommie Downs with murder [2] and con-

---

* The HONORABLE WILLIAM R. COLLINSON, Senior United States District Judge for the Eastern and Western Districts of Missouri, sitting by designation.

1. The Honorable John B. Jones, United States District Judge for the District of South Dakota.

2. The information charged that the defendants jointly, willfully, intentionally and feloniously, on or about the 10th day of October, 1975, with malice aforethought, and without authority of law, and with premeditated design, and without justifiable or excusable cause, [did] perpetrate and effect the death of RUTH K. FLITTIE in her home situate in the City of Brookings, County of Brookings, State of South Dakota; in that the said TOMMY ED-

spiracy to commit murder.[3] The charges arose from the death of Flittie's stepmother on October 10, 1975. Downs pleaded guilty to murder and received a life sentence. On April 26, 1978, a jury convicted Flittie on the conspiracy charge and acquitted him of murder. Eight months later, Flittie was charged with first-degree burglary and accessory after the fact to murder.[4] After considering evidence substantially similar to that presented in the first trial, the jury convicted Flittie on both charges. On appeal, a divided panel of the South Dakota Supreme Court reversed the burglary conviction on collateral estoppel grounds. The accessory conviction was upheld. *State v. Flittie*, 318 N.W.2d 346, 348–49 (S.D.1982).

The evidence at both trials showed that Flittie hired Downs to kill Mrs. Flittie and make her death look like an accident.[5] Roger Flittie obtained a key to his mother's house from his brother, Bruce, and through Willie Harris delivered the key and a diagram of the house to Downs. Downs testified that he entered Ruth Flittie's residence and struck her twice with the lamp. Flittie was on a hunting trip at the time of the murder. Downs stated that later Harris gave him $200, and told him to go to Tucson, where arrangements would be made to take care of his expenses. Downs and his companion, Lori Kaprelian, traveled to Tucson and contacted one of Flittie's friends, Larry Brandon. Several money orders were sent to Brandon by Flittie; they were cashed and the proceeds given to Kaprelian. Several other money orders were sent to Tucson and picked up by Kaprelian. At the second trial, Downs testified that he was finally paid $6,000 to $7,000 of the $10,000 he had been promised by Flittie, but that the money Flittie sent to Tucson was not a part of this payment.

**I.**

Flittie raises several claims under the double jeopardy clause. The fifth amendment provides that no person shall "be subject for the same offence to be twice put in jeopardy of life or limb." U.S. Const. amend. V; *see also Benton v. Maryland*, 395 U.S. 784, 794–96, 89 S.Ct. 2056, 2062–64, 23 L.Ed.2d 707 (1969) (double jeopardy clause applied to the states). The

---

WARD DOWNS did, then and there, brutally beat the said RUTH K. FLITTIE on and about her head with a blunt instrument, thereby causing injuries to the said RUTH K. FLITTIE, said injuries causing and resulting in the death of the said RUTH K. FLITTIE; and the said ROGER GEORGE FLITTIE did aid and abet the said TOMMY EDWARD DOWNS to commit the said killing, and did so by the offer of compensation and assistance to the said TOMMY EDWARD DOWNS and said Defendants did then and there and by said means commit the offense of Murder as defined by SDCL 22–16–4.
1st Trial Record at 21.

3. The information charged that the defendants [d]uring the weeks immediately preceding the 10th day of October, 1975, and thereafter until on or about the 10th day of May, 1976, [did] willfully, intentionally, conjointly and feloniously conspire with each other to commit the crime of Murder in violation of SDCL 22–16–4, in that said ROGER GEORGE FLITTIE and the said TOMMY EDWARD DOWNS did conspire and plan the taking of the life of one RUTH K. FLITTIE, mother of the Defendant, ROGER GEORGE FLITTIE, thereby enabling the said ROGER GEORGE FLITTIE to inherit from his mother's estate and that pursuant to said plan, the said Defendant ROGER GEORGE FLITTIE agreed to pay the said TOMMY EDWARD DOWNS for the killing of his mother.
1st Trial Record at 20.

4. The information charged that:
On or about and after the 10th day of October, 1975, in the County of Brookings, State of South Dakota, ROGER GEORGE FLITTIE did commit the public offense of being an Accessory to Murder (SDCL 22–3–5) in that said ROGER GEORGE FLITTIE did feloniously, after the commission of a felony, to-wit: Murder, aid and conceal one Tommy Edward Downs, with knowledge that said Tommy Edward Downs had committed said murder and with the intent that said Tommy Edward Downs would avoid and escape from arrest, trial, conviction, and punishment.
2d Trial Record at 46.

5. Prior to the second trial, the judge ruled that the state would not be permitted to "go into the fact that Roger Flittie hired [Downs] to go up [to Brookings] to murder his mother." 2d Trial Transcript at 21. The state was permitted to and did prove, however, that Downs was hired to go to Brookings for some purpose and that a murder was committed there.

Supreme Court has recognized three situations that implicate double jeopardy concerns: retrial for the same offense following acquittal; retrial for the same offense after conviction; and multiple punishments for conviction of a single offense. *North Carolina v. Pearce*, 395 U.S. 711, 717, 89 S.Ct. 2072, 2076, 23 L.Ed.2d 656 (1969); *see* Note, *Twice in Jeopardy*, 75 Yale L.J. 262, 265–66 (1965). In addition, the fifth amendment embodies the federal rule of collateral estoppel. *Ashe v. Swenson*, 397 U.S. 436, 444, 90 S.Ct. 1189, 1194, 25 L.Ed.2d 469 (1970). Flittie raises all these issues except the prohibition against multiple punishments.

**A.**

■ The first question is whether Flittie's acquittal of the murder charge or conviction on the conspiracy charge prevented a trial on the accessory count. The second trial was permissible if murder or conspiracy to murder is not the "same offence" as accessory to murder. Two offenses are not the same if one requires proof of a fact that the other does not require. *Blockburger v. United States*, 284 U.S. 299, 304, 52 S.Ct. 180, 182, 76 L.Ed. 306 (1932). This test focuses on the statutory elements of the offenses, rather than the evidence presented at trial. *Illinois v. Vitale*, 447 U.S. 410, 416, 100 S.Ct. 2260, 2265, 65 L.Ed.2d 228 (1980).

■ There can be no doubt that murder and accessory to murder are not the same offense. *Compare* S.D. Codified Laws

Ann. § 22–16–4 (1979) (murder) *and* note 2 *supra with id.* § 22–3–5 (accessory) *and* note 4 *supra*. Only slightly less obvious is that conspiracy to commit murder is not the same offense as accessory to murder. *Compare* § 22–3–5 *and* note 4 *supra with id.* § 22–3–8 (conspiracy) *and* note 3 *supra*. Thus, acquittal of the murder charge and conviction on the conspiracy charge did not prevent trial on the accessory count.[6]

**B.**

Initially developed in civil cases, the doctrine of collateral estoppel provides that an issue of ultimate fact determined by a valid final judgment cannot be litigated again between the same parties. *Ashe v. Swenson*, 397 U.S. 436, 443, 90 S.Ct. 1189, 1194, 25 L.Ed.2d 469 (1970).[7] The following test is applied in criminal cases:

> Where a previous judgment of acquittal was based upon a general verdict, as is usually the case, this approach requires a court to "examine the record of a prior proceeding, taking into account the pleadings, evidence, charge, and other relevant matter, and conclude whether a rational jury could have grounded its verdict upon an issue other than that which the defendant seeks to foreclose from consideration."

*Id.* at 444, 90 S.Ct. at 1194 (quoting Mayers & Yarbrough, Bis Vexari: *New Trials and Successive Prosecutions*, 74 Harv.L.Rev. 1, 38–39 (1960)).

**6.** Flittie maintains that the double jeopardy clause was violated by the trial court's refusal to instruct the second jury that Flittie had been found not guilty of murdering Ruth Flittie. No authority is offered to support this argument. The omission of an instruction is grounds for habeas relief only if it infected the whole proceeding such that the defendant was denied a fair trial. *Tyler v. Wyrick*, 635 F.2d 752, 753 (8th Cir.1980) (per curiam), *cert. denied*, 452 U.S. 942, 101 S.Ct. 3089, 69 L.Ed.2d 958 (1981). The absence of the proferred instruction did not deprive Flittie of a fair trial. Considerable evidence was presented concerning the murder because the state had to prove the event to sustain the accessory charge. The state never contended, however, that Flittie murdered his mother in

the sense that he was present at the scene and beat her to death. Thus, there was no error in refusing to instruct the jury that Flittie was not guilty of murder.

**7.** In *Ashe*, six men had been robbed by four individuals. The defendant was acquitted of robbing one of the victims. He was then indicted for robbing one of the other six men. The Supreme Court held that the first acquittal was based on the jury finding that the defendant had not participated in the robbery. Because the ultimate fact of participation was resolved in the defendant's favor at the first trial, collateral estoppel precluded retrial of the fact. 397 U.S. at 446, 90 S.Ct. at 1195.

**1.**

Flittie argues that collateral estoppel should have prevented trial on the accessory count. Any preclusive effect must flow from Flittie's acquittal on the murder charge; the conviction on the conspiracy charge cannot bar later proceedings by the state. The *Ashe* rule refers only to acquittals. Collateral estoppel is a good defense only as to ultimate issues determined at the first trial in the defendant's favor. *See Moton v. Swenson,* 488 F.2d 1060, 1062–63 (8th Cir.1973), *cert. denied,* 417 U.S. 957, 94 S.Ct. 3086, 41 L.Ed.2d 675 (1974); *Percy v. South Dakota,* 443 F.2d 1232, 1235 (8th Cir.), *cert. denied,* 404 U.S. 886, 92 S.Ct. 223, 30 L.Ed.2d 169 (1971); C. Whitebread, *Criminal Procedure* § 24.04, at 509 (1980).

Thus, the issue narrows to whether the jury acquitting Flittie of murder could have rationally grounded its verdict on an ultimate fact essential to an accessory conviction. The acquittal on the murder charge implied that the jury resolved some issues in Flittie's favor. Under *Ashe,* then, the next step is to determine what issues were resolved in Flittie's favor, and whether any of these issues are elements of the accessory charge.

We begin by examining the charges to the juries. In the first trial, Flittie was convicted of conspiracy. The jury had to find that: (1) two or more persons conspired to commit murder; (2) one of these persons was Flittie; and (3) either Flittie or Downs' conspirator did any overt act to effect the object of conspiracy.

To find Flittie not guilty of murder, the first jury had to find that one or more of the following elements were not proven beyond a reasonable doubt that: (1) Flittie as an accomplice caused to be inflicted an injury or injuries upon the deceased from which the deceased died; (2) Flittie did so with premeditated design to effect the death of the deceased; and (3) the killing

was without authority of law and without justification.

To convict Flittie as an accessory after the fact, the second jury had to find that: (1) Downs murdered Ruth Flittie on October 1, 1975; (2) Flittie concealed or aided Downs after the murder; (3) at the time Flittie concealed or aided Downs he knew that Downs had murdered Ruth Flittie; and (4) Flittie concealed or aided Downs with the intent that Downs would avoid or escape arrest, trial, conviction, or punishment.

The South Dakota Supreme Court found the jury that acquitted the defendant on the murder charge "could not have rationally grounded its verdict on an issue other than whether [Flittie] * * * had aided or abetted Downs." 318 N.W.2d at 348.

Flittie argues that the first jury could have decided that his post-murder conduct was sufficient to support a murder conviction, and that the acquittal on the murder charge indicated that the jury found Flittie was not an after-the-fact participant. Consequently, this issue would be barred in the second trial as resolved in Flittie's favor at the first.

This argument is unconvincing. The guilty verdict on the conspiracy charge belies the contention that the first jury thought Flittie was not guilty of after-the-fact participation. The South Dakota Supreme Court found it "evident that the jury in the first trial convicted defendant on the conspiracy charge based on his post-murder conduct." 318 N.W.2d at 349.[8] Even the dissenting justices agreed that the first jury found that Flittie had aided Downs after the murder. *See id.* at 350–51 (Fosheim, J., dissenting).

This instruction from the first trial helps to rationalize the verdicts: "So in this case if you should find beyond a reasonable doubt that Tommy Edward Downs was a principal and Roger George Flittie an ac-

---

**8.** The court noted that: (1) the information on the conspiracy count was based in part on Flittie's overt acts in paying money to Downs after the murder; and (2) "[c]onsiderable evidence" was introduced in the first trial showing that Flittie sent Downs to Tucson and forwarded money to him there. 318 N.W.2d at 349.

cessory *before the fact* to the commission of the murder, the defendant Flittie would be guilty thereof." 1st Trial Record at 119 (emphasis added). The first jury could have found that Flittie had engaged in culpable conduct after the murder and based the conspiracy conviction on this finding. The acquittal on the murder count may rationally reflect the jury's belief that Flittie had not acted as an accessory before the fact. A finding that Flittie did not act as an accessory before the fact does not preclude trying Flittie as an accessory after the fact.

**2.**

■ Flittie contends that collateral estoppel should have prevented the trial court from allowing the introduction of any evidence admitted during the first trial. This argument's success depends on whether the *Ashe* doctrine extends to bar relitigation of evidentiary facts.

The fact central to this issue is whether Flittie acted as an accessory to the murder before the fact. This fact was an essential (ultimate) fact in the trial on the murder charge. The conviction on the accessory after the fact count, however, did not depend on finding whether Flittie was an accessory before the fact. Thus, the same fact was only evidentiary in the second trial. *See generally* Note, *Collateral Estoppel Effect of Prior Acquittals*, 46 Brooklyn L.Rev. 781, 788–90 (1980) (difference between evidentiary and ultimate facts).

■ The law in this circuit is that collateral estoppel does not bar relitigation of facts that are evidentiary in the second prosecution. *United States v. Riley*, 684 F.2d 542, 546 (8th Cir.1982), *cert. denied,*

459 U.S. 1111, 103 S.Ct. 742, 74 L.Ed.2d 962 (1983); *see King v. Brewer*, 577 F.2d 435, 440–41 (8th Cir.1978), *cert. denied,* 440 U.S. 918, 99 S.Ct. 1238, 59 L.Ed.2d 468 (1979); *United States v. Kills Plenty*, 466 F.2d 240, 243 (8th Cir.1972), *cert. denied,* 410 U.S. 916, 93 S.Ct. 971, 35 L.Ed.2d 278 (1973).[9]

**II.**

Flittie argues that it was error for the trial court to admit a videotape of a conversation between he and William Harris. Harris was a good friend of Flittie; they had been acquainted for ten years, and it was Harris who had first introduced the defendant to Downs. Prior to December 5, 1977, Harris had been arrested on two forgery charges. On January 9th of the next year, Harris entered into an agreement with state officials that provided for dismissal of the forgery charges. The terms required Harris to cooperate with law enforcement officials in "attempting to illicit [sic] incriminating statements" from Roger Flittie. 2d Trial Record at 94.

That evening, Harris was taken to the state penitentiary to visit the defendant, who was incarcerated on a conviction unrelated to his mother's death. Although not compelled to do so by prison policy or practice, Flittie agreed to see and converse with Harris. The defendant was unaware, however, that Harris and the visiting room had been equipped to make audio and video recordings of the discussion.

During the conversation, Harris made several statements that he conceded at trial were lies. He misrepresented to Flittie that Downs had been requesting more money for his role in the murder and falsely

---

**9.** The court in the second trial was not insensitive to Flittie's double jeopardy concerns. The following exchange took place in chambers before opening statements:

Well, as we discussed off the record, it's the court's opinion that you cannot go into facts, ultimate facts which were previously determined by a jury in the murder trial of the defendant Roger Flittie, and that you can have your witnesses testify concerning the contacts between the defendant and Tommy Downs and the conversations between them short of the

statement by the defendant Roger Flittie that he wanted Downs to go to Brookings to kill his mother. And that you can prove the contact and the furnishing of the key and you can prove the conversations relative to Roger Flittie wanting Tommy Downs to go to Brookings and that the defendant furnished him with maps concerning the location of his mother's house. I think that's about as far as you can go.
2d Trial Transcript at 18. Thus, the trial court may have given Flittie more estoppel protection than the Constitution requires.

implied that Downs intended to satisfy his demands out of Flittie's property. In response to these false comments and other discussion, Flittie made several incriminating statements. A videotape recording of these statements was played for the jury.[10]

### A.

■ The first argument is that admission of the tape violated the fourth amendment. Flittie had a full and fair opportunity to litigate this issue in the South Dakota courts. We cannot, therefore, set aside the conviction on this ground. *See Stone v. Powell,* 428 U.S. 465, 494, 96 S.Ct. 3037, 3052, 49 L.Ed.2d 1067 (1976); *Gregory v. Wyrick,* 730 F.2d 542, 543 (8th Cir.1984) (per curiam).

### B.

■ Second, Flittie argues that admission of the tape violated his sixth amendment right to counsel. At the time the tape was made, Flittie was neither under arrest for nor charged with his stepmother's murder. Therefore, he had no sixth amendment right to counsel. *See Brewer v. Williams,* 430 U.S. 387, 398–99, 97 S.Ct. 1232, 1239–40, 51 L.Ed.2d 424 (1977); *Massiah v. United States,* 377 U.S. 201, 205, 84 S.Ct. 1199, 1202, 12 L.Ed.2d 246 (1964); *United States v. Grego,* 724 F.2d 701, 702–03 (8th Cir.1984); *United States v. Dobbs,* 711 F.2d 84, 85 (8th Cir. 1983). The record shows that the defendant was arrested and charged within several hours after the tape was recorded. Flittie argues that the arrest was delayed solely to deprive him of his *Massiah* rights. Intentional and unnecessary delay by the government in bringing an indictment may invoke the sixth amendment right to counsel. *United States v. Dobbs,* 711 F.2d 84, 85 n. 1 (8th Cir.1983) (dictum). This case, however, is not within the *Dobbs* exception to the *Massiah* rule. Although Flittie had become a primary suspect when the tape was recorded, the government's delay was not unnecessary. Prior to the day when the tape was made, law enforcement officials felt that there was not enough evidence to support the charge against Flittie. The evening before the indictment produced a series of events substantially augmenting the evidence incriminating Flittie. Most important was the arrest of Downs and his subsequent confession to murdering Ruth Flittie. *See South Dakota v. Flittie,* No. 78–2011, II Suppression Hearing Transcript 4–5 (Mar. 30, 1978). Thus, the timing of the arrest is consistent with the accumulation of evidence implicating Flittie. *Cf. Hoffa v. United States,* 385 U.S. 293, 310, 87 S.Ct. 408, 417, 17 L.Ed.2d 374 (1966) ("The police are not required to guess at their peril the precise moment at which they have probable cause to arrest a suspect, risking a violation of the Fourth Amendment if they act too soon, and a violation of the Sixth Amendment if they wait too long.").

### C.

■ Flittie's final claim with respect to the tape is that its admission violated fifth amendment guarantees against self-incrimination. The first issue is whether Flittie's *Miranda* rights were violated. *See Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Without reaching the merits of this claim,[11] we conclude that admission of the tape was harmless beyond a reasonable doubt. "The admission of statements obtained in violation of *Miran-*

---

**10.** In ruling on a motion to suppress the tape, the trial court found:

> That the Defendant, Roger Flittie, was not compelled to see Mr. Harris, but did so voluntarily.
> That the Defendant could have refused to meet with Mr. Harris.
> That the visit between Mr. William Harris, Jr. and the Defendant lasted approximately fifteen minutes.
> That Mr. William Harris, Jr. did not threaten or coerce Mr. Flittie in any manner.

> That the Defendant was free to terminate the visit and go back to his cell at any time.

*State v. Flittie,* No. 78–2340, Order Denying Motion to Suppress at 3 (S.D.Cir.Ct. Nov. 19, 1979). These findings are presumed correct. *See Sumner v. Mata,* 449 U.S. 539, 101 S.Ct. 764, 66 L.Ed.2d 722 (1981).

**11.** An argument can be made that Flittie was entitled to *Miranda* warnings. He was in custody and Harris, his one-time friend, deliberately elicited incriminating information from him. The government had entered into a written

*da* may constitute harmless error when there remains overwhelming independent evidence as to the defendant's guilt." *United States v. Packer*, 730 F.2d 1151, 1157 (8th Cir.1984) (citations omitted); *see also United States v. Hasting*, 461 U.S. 499, 103 S.Ct. 1974, 1979, 76 L.Ed.2d 96 (1983) (reviewing court must consider the record as a whole and ignore errors that are harmless, including most constitutional violations).

■ Flittie's taped statements were not the key to the state's case. Less than fifteen minutes in length and barely audible in spots, the tape contained only a few marginally incriminating statements. Most of the statements did not relate to the accessory after the fact charge.

Four different witnesses testified concerning Flittie's aid to Downs after the fact, including Downs, Harris, Kaprelian, and Brandon. Physical evidence, in the form of phone records and cancelled money orders, added support. To counter this evidence, the defendant chose only to attack the credibility of the state's witnesses. It is unlikely that the videotape had a major impact on the jury in determining whether these witnesses were believable. The whole record shows overwhelming independent evidence to support the conviction. *See also Milton v. Wainwright*, 407 U.S. 371, 92 S.Ct. 2174, 33 L.Ed.2d 1 (1972) (admission of confession related by accused to undercover police officer posing as cellmate found harmless).

■ The second fifth amendment issue is whether the statements were coerced.

The tape would be inadmissible unless the totality of circumstances shows that Flittie's statements were the product of a free and rational choice. *See Greenwald v. Wisconsin*, 390 U.S. 519, 521, 88 S.Ct. 1152, 1154, 20 L.Ed.2d 77 (1968) (per curiam).[12] The basis of any fifth amendment claim must be some kind of compulsion. *Hoffa v. United States*, 385 U.S. 293, 304, 87 S.Ct. 408, 414, 17 L.Ed.2d 374 (1966). Flittie raises a number of grounds to support his coercion claim.

■ The first is that he was in the South Dakota penitentiary when the statements were taken. The Supreme Court recognized in *Miranda v. Arizona*, 384 U.S. 436, 467, 86 S.Ct. 1602, 1624, 16 L.Ed.2d 694 (1965), the compelling pressures upon incarcerated persons. Flittie was in custody, but on an unrelated matter. Incarceration does not ipso facto make a statement involuntary. *See Cervantes v. Walker*, 589 F.2d 424, 427 (9th Cir.1978). While Flittie may have been constrained within the penitentiary walls, he was not forced to remain in the visitors' room with Harris. Thus, the imprisonment did not produce a coerced statement.

Second, Flittie maintains that Harris's hidden link to law enforcement officials was a form of coercion. At the time of the encounter, Flittie was unaware that Harris was cooperating with the state. The use of a secret informer, however, is not unconstitutional per se. *Hoffa*, 385 U.S. at 311, 87 S.Ct. at 418. "Where a defendant's conversations with an informant are voluntary and the informant's presence was wholly

---

agreement with Harris and supervised the taping session. *See United States v. Henry*, 447 U.S. 264, 270–73, 100 S.Ct. 2183, 2186–88, 65 L.Ed.2d 115 (1980); *Rhode Island v. Innis*, 446 U.S. 291, 301, 100 S.Ct. 1682, 1689, 64 L.Ed.2d 297 (1980); *Mathis v. United States*, 391 U.S. 1, 4–5, 88 S.Ct. 1503, 1504–1505, 20 L.Ed.2d 381 (1968); *United States v. Surridge*, 687 F.2d 250, 253–55 (8th Cir.), *cert. denied*, 459 U.S. 1044, 103 S.Ct. 465, 74 L.Ed.2d 614 (1982).

We believe, however, that the confrontation was merely a dialogue between Harris and Flittie. There was no express questioning, and Harris received no specific instructions from the government regarding the direction of the conversation. The theme underlying *Miranda* and its progeny is government compulsion, and we

see no such compulsion here. Although we do not reach the merits of this issue, we express no approval of the state's taping scheme. The frustration of the prosecuting authorities is understandable. There is, however, no excuse for this questionable conduct, which might result in reversal in a closer case.

**12.** If the statements were coerced, their admission could not have been harmless error. *See United States v. Hasting*, 461 U.S. 499, 103 S.Ct. 1974, 1977 n. 6, 76 L.Ed.2d 96 (1983); *Chapman v. California*, 386 U.S. 18, 23, 87 S.Ct. 824, 827, 17 L.Ed.2d 705 (1967); *Payne v. Arkansas*, 356 U.S. 560, 567–68, 78 S.Ct. 844, 849–50, 2 L.Ed.2d 975 (1958).

voluntary, admissions made by the defendant do not violate the * * * privilege against compulsory self-incrimination." *United States v. Davis*, 646 F.2d 1298, 1302 (8th Cir.) (footnote and citation omitted), *cert. denied*, 454 U.S. 868, 102 S.Ct. 333, 70 L.Ed.2d 170 (1981). Flittie agreed to see Harris of his free will, and he was equally free to terminate the conversation at his pleasure. That the statement was secretly recorded does not itself vitiate the consent. *See id.* at 1300.

Finally, Flittie urges that his responses were coerced because they were prompted by Harris's statements, some of which, Flittie argues, were untruthful and possibly threatening. Misrepresentations on the part of the government do not make a statement per se involuntary. *See Frazier v. Cupp*, 394 U.S. 731, 739, 89 S.Ct. 1420, 1424, 22 L.Ed.2d 684 (1969); *United States ex rel. Galloway v. Fogg*, 403 F.Supp. 248, 252 (S.D.N.Y.1975).

The totality of circumstances shows that Flittie's statements were the product of a free and rational choice. It was not, therefore, a violation of the fifth amendment to admit the videotape.

**III.**

■ Two other issues have been raised. It is argued that a delay of more than two years in filing the information denied Flittie due process. To prevail on this claim, the defendant must show that the delay was unreasonable and prejudicial. *United States v. Bliss*, 735 F.2d 294, 300–01 (8th Cir.1984); *Matthews v. Lockhart*, 726 F.2d 394, 396–97 (8th Cir.1984). Even if the delay here was unreasonable, the defendant has failed to show prejudice. Flittie's general allegation that fading memories precluded an effective defense is insufficient. *See United States v. Marion*, 404 U.S. 307, 326, 92 S.Ct. 455, 466, 30 L.Ed.2d 468 (1971); *United States v. Taylor*, 603 F.2d 732, 735 (8th Cir.), *cert. denied*, 444 U.S. 982, 100 S.Ct. 487, 62 L.Ed.2d 410 (1979). Flittie also contends that pursuit of the charges was selective and discriminatory. This argument is without merit.

The judgment of the district court is affirmed.

HEANEY, Circuit Judge, dissenting.

I would reverse the judgment of the district court.

The fifth amendment guards against second prosecutions for the same offense after an acquittal or a conviction, and protects against multiple punishments for the same offense. *North Carolina v. Pearce*, 395 U.S. 711, 717, 89 S.Ct. 2072, 2076, 23 L.Ed.2d 656 (1969). The amendment's protection against double jeopardy includes the rule of collateral estoppel. *Ashe v. Swenson*, 397 U.S. 436, 444, 90 S.Ct. 1189, 1194, 25 L.Ed.2d 469 (1970).

The majority concludes that the collateral estoppel rule is only applicable as to ultimate issues determined at the first trial in the defendant's favor. The cases which appear to support this position do so without explanation, *see, e.g., Moton v. Swenson*, 488 F.2d 1060, 1062 (8th Cir.1973), *cert. denied*, 417 U.S. 957, 94 S.Ct. 3086, 41 L.Ed.2d 675 (1974) ("prior acquittal was * * the linchpin of the *Ashe* decision"); *Percy v. South Dakota*, 443 F.2d 1232, 1235 (8th Cir.), *cert. denied*, 404 U.S. 886, 92 S.Ct. 223, 30 L.Ed.2d 169 (1971) ("even if we were to assume that the essential elements of kidnapping were incidentally determined at the first trial, *Ashe* would not control because here, as distinguished from *Ashe*, the jury found appellant guilty."); *United States v. DeMarrias*, 441 F.2d 1304, 1307 (8th Cir.1971) ("Here the Tribal Court convicted. In *Ashe*, the jury acquitted.") In my view, they misconstrue *Ashe* and defeat the purpose of the double jeopardy clause.

*Ashe* did not hold that collateral estoppel only applies when the defendant was acquitted in the first litigation. Rather, it held that Ashe could not be reprosecuted for robbery after the jury in the first trial acquitted him of robbing a different victim, based upon the determination that Ashe had not been present at the robbery. *Ashe v. Swenson*, 397 U.S. at 446, 90 S.Ct. at 1195. Thus, the state was prevented from presenting the same or different identification evidence in a second prosecution by the collateral estoppel rule. *Id.* The Court

defined collateral estoppel as meaning simply

> that when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit.

*Id.* at 443, 90 S.Ct. at 1194.

The only reference to a prior acquittal occurs in the Court's emphasis that the rule of collateral estoppel must be applied with "realism and rationality." The Court stated as an example that where a previous judgment of acquittal was based upon a general verdict, the court must inquire into the record carefully and decide whether a "rational jury could have grounded its verdict upon an issue other than that which the defendant seeks to foreclose from consideration." *Id.* at 444, 90 S.Ct. at 1194 (citation omitted). The concern of the Court was that

> [a]ny test more technically restrictive would, of course, simply amount to a rejection of the rule of collateral estoppel in criminal proceedings, at least in every case where the first judgment was based upon a general verdict of acquittal.

*Id.* (footnote omitted).

This reference can hardly be considered a holding that collateral estoppel is available *only* when the defendant has been acquitted in the first case. A further indication that the Court intended no such rule is its reliance upon Justice Holmes's opinion in *United States v. Oppenheimer*, 242 U.S. 85, 37 S.Ct. 68, 61 L.Ed. 161 (1916), which states:

> Where a criminal charge has been adjudicated upon by a court having jurisdiction to hear and determine it, the adjudication, *whether it takes the form of an acquittal or conviction*, is final as to the matter so adjudicated upon, and may be pleaded in bar to any subsequent prosecution for the same offense. * * * In this respect the criminal law is in unison with that which prevails in civil proceedings.

*Id.* at 88, 37 S.Ct. at 69, quoting Hawkins, J., in *Reg. v. Miles*, L.R. 24 Q.B.Div. 423, 431 (emphasis added).

There is no requirement in civil cases that the party raising collateral estoppel as a defense must be successful in the prior litigation. I find no reason why such a rule should exist in criminal cases, especially in light of the Supreme Court's repeated emphasis that collateral estoppel is available in criminal cases because a criminal defendant deserves the same protection which the law affords a civil party. *Ashe*, 397 U.S. at 443, 90 S.Ct. at 1194; *Oppenheimer*, 242 U.S. at 87, 37 S.Ct. at 69. The finality of a determination of an ultimate factual issue applies with equal force to civil and criminal proceedings; it is completely irrelevant whether a defendant was convicted or acquitted in the first proceeding where this determination was made.

A careful analysis of the issues decided by the jury in Flittie's first trial reveals that his conviction in the second trial for accessory after the fact to murder results in double jeopardy. In his first trial, Flittie was charged with murder (aiding and abetting) and conspiracy to murder. The jury acquitted Flittie of the murder charge and convicted him of conspiracy. The record establishes that the jury convicted him of conspiracy based upon his post-murder conduct in concealing or aiding Downs by sending him money and arranging for him to go to Tucson after the murder. The information charging Flittie with conspiracy cited his conduct dating seven months after the date of the murder. At closing argument in the first trial, Flittie's attorney all but conceded that Flittie was involved after the fact, but hotly disputed that Flittie was guilty of conspiracy and murder. The jury instructions concerning the conspiracy charge allowed the jury to convict Flittie based upon his conduct after the fact. The South Dakota Supreme Court reviewed the pleadings, evidence, closing arguments, and jury instructions, and concluded that "[i]t is evident that the jury in the first trial convicted defendant on the conspiracy charge based upon his post-murder conduct." *State v. Flittie*, 318 N.W.2d 346, 349 (S.D.1982). The majority opinion does not dispute this conclusion.

To allow the accessory conviction to stand allows the state a second chance to prosecute Flittie for assisting Downs after the murder. Once a jury convicted Flittie of a crime based upon his post-murder conduct, the state cannot present this same conduct as evidence of a different crime in a second prosecution without violating the fifth amendment. Presumably, the prosecution was disappointed by the jury's verdict in the first trial, acquitting Flittie of aiding and abetting murder but convicting him of conspiracy. But, as the Supreme Court stressed in *Ashe:*

> No doubt the prosecutor felt the state had a provable case on the first charge and, when he lost, he did what every good attorney would do—he refined his presentation in light of the turn of events at the first trial. *But this is precisely what the constitutional guarantee forbids.*

*Ashe,* 397 U.S. at 447, 90 S.Ct. at 1196 (emphasis added).

In order to give meaning to the double jeopardy clause and *Ashe,* the judgment of the district court must be reversed.