UNITED STATES of America, Appellee,

v.

Richard WILLOUGHBY, Quintin Prioleau, Arthur Prioleau, and Carleton Montgomery, Defendants–Appellants.

Nos. 1295, 1285–1287, Dockets 88–1067 to 88–1070.

United States Court of Appeals, Second Circuit.

Argued June 21, 1988.
Decided Oct. 6, 1988.

Joan McPhee, Asst. U.S. Atty., New York City (Rudolph W. Giuliani, U.S. Atty. S.D.N.Y., Kerri L. Martin, Asst. U.S. Atty., New York City, on the brief), for appellee.

Joan Palermo, New York City (Louis R. Aidala, New York City, on the brief), for defendant-appellant Willoughby.

Wiseman & Kinigstein, New York City (Michael Wiseman, New York City, of counsel), submitted a brief for defendant-appellant Quintin Prioleau.

Daniel M. Felber, New York City (Balsam & Felber, New York City, on the brief), for defendant-appellant Arthur Prioleau.

David E. Liebman, New York City, for defendant-appellant Montgomery.

Before NEWMAN, KEARSE and CARDAMONE, Circuit Judges.

KEARSE, Circuit Judge:

Defendants Richard Willoughby, Quintin Prioleau ("Quintin"), Arthur Prioleau ("Arthur"), and Carleton Montgomery appeal from judgments entered after a jury trial in the United States District Court for the Southern District of New York before Morris E. Lasker, *Judge*, convicting them of conspiracy to obstruct justice, in violation of 18 U.S.C. § 371 (1982), in connection with an impending trial of Quintin, Arthur, and Montgomery for armed robbery; and convicting Quintin of witness tampering, in

violation of 18 U.S.C. § 1512(b)(2)(D) (1982 & Supp. IV 1986). Arthur and Montgomery were sentenced to one-year prison terms; Quintin was sentenced to concurrent one-year prison terms on each of the two counts on which he was convicted. Each of these sentences was to run consecutively to sentences previously imposed on Arthur, Montgomery, and Quintin for convictions of bank robbery. Willoughby was given a suspended sentence and placed on three years' probation. Each defendant was assessed $50 for each count on which he was convicted, under 18 U.S.C. § 3013(a)(2)(A) (1982 & Supp. IV 1986).

On appeal, defendants contend principally that the trial court erred in admitting into evidence tape recordings of conversations held in June 1987 between Quintin and Willoughby, Quintin and Montgomery, and Arthur and a government witness. For the reasons below, we affirm the judgments of conviction.

## I. BACKGROUND

In July 1987, Arthur, his brother Quintin, and Montgomery were convicted of the armed robbery of the City College branch of Chemical Bank ("Chemical branch") in New York City. The present prosecution arises out of their efforts, with Willoughby, to prevent certain witnesses from testifying at the trial of the bank robbery charges. The record in the present case includes the following.

### A. *The Events of June 1987*

In the spring of 1987, Arthur, Quintin, and Montgomery were inmates at the New York Metropolitan Correctional Center ("MCC"), awaiting trial, scheduled for July of that year, on the charges that they and one Cornel Everett ("Cornel") had robbed the Chemical branch in March 1982. In June 1987, Arthur sent word to Sabrina Johnson, who had been one of his girlfriends in early 1982, that he wanted her to visit him at MCC on June 11.

During the investigation of the robbery, Johnson had been in contact with Agent Paul Harvey of the Federal Bureau of Investigation. On June 10, 1987, she informed Harvey and Assistant United States Attorney Joan McPhee of Arthur's request that she visit him at MCC. Johnson, after being advised that it was solely her decision whether or not to visit Arthur, stated that she probably would visit him. The government was aware that Arthur and Johnson had been largely out of contact for several years, that he had recently made repeated efforts to contact her, and that in 1982 he had conversed with Johnson about the Chemical branch robbery and had then told her he might marry her in order to prevent her from testifying against him. Recognizing that the government's case on the robbery charges consisted primarily of the testimony of defendants' friends such as Johnson and one Patricia White, another of Arthur's girlfriends in early 1982, McPhee was concerned that Arthur would attempt to intimidate Johnson or to influence her testimony at the robbery trial and therefore asked Johnson if she would be willing to wear a concealed recording device during the visit. Johnson agreed to do so, and her June 11 conversation with Arthur was thus taped.

During the June 11 visit, Arthur and Johnson discussed the 1982 robbery and the evidence available to the government to prove that Arthur, Quintin, and others had perpetrated it. Arthur stated that he had gotten the idea for the robbery from "Pat" (Patricia White testified in the present case that she had mentioned to Arthur in early 1982 that the Chemical branch would be easy to rob) and that he had passed the idea along to Quintin and others. He said the government would have had no evidence against him and Quintin but for the fact that "Ina and Pat snitched on us." He stated, "Ina and Pat snitched. They did a lot of talking .... That's what happened. Other than that, they didn't have no case." (Ellipsis in tape transcript.) He predicted that the robbery trial would end in acquittal "because they don't have no evidence. It's alot [*sic*] of hearsay. Nobody from the bank identified nobody. It's just Ina and, um, Pat's testimony, that's holdin' us."

Arthur indicated that defendants had sent threats to Ina and had attempted to locate Pat to prevent their "stand[ing] in our way." He stated, "we sent a few people around there [to Ina] to tell her, if Ina comes, they'll have to move her mother out of the block, anybody who's part of her family, ..." but stated that they had not "been able to locate" Pat. Arthur advised Johnson that, if she were questioned again by law enforcement officers, she should "[t]ell 'em that you don't know nothing, just leave it at that." He said, "You watch enough TV to know what happens to snitches."

On June 22, 1987, with Montgomery at his side, Quintin called Willoughby at his home, using an MCC telephone that was available to inmates. Pursuant to MCC policy, of which inmates were advised upon their arrival at MCC, and notice of which they were requested to acknowledge in writing (*see* Part II.A.1. below), all inmate calls from MCC institutional telephones, except properly placed calls to attorneys, were automatically recorded and were monitored on a random basis. Quintin's call to Willoughby was thus recorded. In addition, the call was monitored, and an MCC official visually observed Quintin and Montgomery from a distance of 15–20 feet.

During the telephone conversation, Quintin and Willoughby discussed preventing testimony by someone referred to as "the person." Quintin stated that "we need somebody to take care of that," and that "Cornel" would make arrangements to have "his man ... do it," but that Cornel's man did not know what "the person" looked like. Willoughby stated that he could "pick out the person" for Cornel's man. Quintin promised to call Willoughby the next day with the telephone number of Cornel's man. He urged Willoughby to make arrangements quickly, stating that "we gotta do it this week," because in the following week the government would serve defendants with its list of prospective witnesses, and after Cornel's man "hit 'em," defendants wanted to be able to say, "we never knew who they was."

Upon completing his call to Willoughby, Quintin attempted to dial another number, and as he did so, Montgomery asked him, "What's the plan?" After Quintin's response, which was unintelligible on the tape, Montgomery said, "You blew the whole plan ...." Quintin replied that they had no one to do the job, asking, "who do you want to do it?" and stating that Willoughby would "go up there with the guy" to identify "her .... I didn't want to mention the name on the phone or nothin' ...." Montgomery asked, "He said he wanna do it?" Quintin assured him that Willoughby had said he knew where to go and what to do. Montgomery walked away in apparent anger.

Because this conversation took place while Quintin was holding the MCC telephone's handset off the hook, the conversation was automatically recorded.

## B. *The Indictments and the Verdicts*

On the basis of these events, defendants were indicted in a five-count indictment. Count one charged all four defendants with conspiracy to tamper with witnesses White and Johnson and to obstruct justice, in violation of 18 U.S.C. § 371; count two charged Quintin with obstruction of justice by endeavoring to influence or prevent the testimony of "certain witnesses," in violation of 18 U.S.C. § 1503 (1982); count three charged Arthur with witness tampering, to wit, threatening Johnson with physical harm if she testified at the robbery trial, in violation of 18 U.S.C. § 1512(b)(2)(A) (1982 & Supp. IV 1986); count four charged Quintin with witness tampering, to wit, attempting to prevent the appearance of White at trial, in violation of 18 U.S.C. § 1512(b)(2)(D); and count five charged Arthur with witness tampering, to wit, directing Johnson to withhold evidence relating to the robbery, in violation of 18 U.S.C. § 1512(b)(3) (1982 & Supp. IV 1986).

Prior to trial, defendants moved to suppress the tape recordings of the June 11 and June 22 conversations on various grounds. To the extent pertinent here, Quintin, Willoughby, and Montgomery moved to suppress the June 22 conversa-

tions on the grounds that the taping of those conversations violated their rights under Title III of the Omnibus Crime Control and Safe Streets Act ("Title III"), 18 U.S.C. §§ 2510–21 (1982 & Supp. IV 1986), and their rights under the Fourth Amendment to the Constitution to be free from unreasonable searches and seizures; Arthur moved to suppress the tape of his June 11 conversation with Johnson on the ground that the taping violated his Fifth Amendment privilege against compulsory self-incrimination because he was not given *Miranda* (*Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 86 L.Ed.2d 694 (1964)) warnings. In a published opinion, *United States v. Montgomery*, 675 F.Supp. 164 (1987), the district court denied the motions to suppress. Relying on *United States v. Amen*, 831 F.2d 373 (2d Cir.1987), *cert. denied*, — U.S. —, 108 S.Ct. 1573, 99 L.Ed.2d 889 (1988), the court held that the taping of the June 22 conversations was permissible under the "consent" exception to Title III; it rejected the Fourth Amendment argument on the ground that the government's interest in prison security outweighed any expectation defendants might have had of privacy in their conversations, especially in light of the notice given that telephone conversations would be intercepted. The court rejected Arthur's *Miranda* claim on the ground that his June 11 conversation with Johnson was voluntary rather than the product of coercion.

Accordingly, the government's evidence at trial included the tape recordings of the June 11 conversation and both June 22 conversations. In addition, there was testimony from several witnesses, including MCC officials, Johnson, and White.

The jury found all four defendants guilty of conspiracy (count one) and found Quintin guilty of witness tampering (count four). Count two against Quintin was dismissed at the close of the government's case; Arthur was acquitted on counts three and five. Defendants were sentenced as indicated above, and these appeals followed.

## II. DISCUSSION

On appeal, Willoughby, Quintin, and Montgomery contend principally that the government's taping of the June 22 conversations violated their rights under Title III and the Fourth Amendment; Arthur contends principally that the use of his June 11 conversation with Johnson violated his *Miranda* rights. In addition, defendants contend that evidence that Quintin, Arthur, and Montgomery participated in the 1982 bank robbery should have been excluded pursuant to Fed.R.Evid. 403 and 404(b), and Montgomery contends that the evidence was insufficient to support an inference that he participated in the conspiracy to obstruct justice. We have considered all of defendants' contentions on these appeals and have found them to be without merit.

### A. *The Quintin–Willoughby Telephone Conversation*

The contentions that the taping of Quintin's telephone call to Willoughby violated Title III and the Fourth Amendment are, as the district court ruled, largely foreclosed by our decision in *United States v. Amen*, 831 F.2d 373.

#### 1. *Title III*

■ Title III generally prohibits the intentional interception of wire communications, including telephone conversations, in the absence of authorization by court order. 18 U.S.C. §§ 2510–2521; *see id.* § 2510(1) ("wire communication" includes any communication "made in whole or in part through the use of facilities for the transmission of communications by the aid of wire, cable, or other like connection" furnished or operated by an interstate common carrier). The prohibition against interception does not apply, however, when "one of the parties to the communication has given prior consent to such interception." *Id.* § 2511(2)(c). Such consent may be express or implied. *United States v. Amen*, 831 F.2d at 378; S.Rep. No. 1097, 90th Cong., 2d Sess., *reprinted in* 1968 U.S.Code Cong. & Admin.News 2112, 2182. In the prison setting, when the institution has advised inmates that their telephone

calls will be monitored and has prominently posted a notice that their "use of institutional telephones constitutes consent to this monitoring," the inmates' use of those telephones constitutes implied consent to the monitoring within the meaning of Title III. *United States v. Amen*, 831 F.2d at 379.

In the present case, the record established that MCC had a policy and practice of automatically recording and randomly monitoring all inmate calls, other than those properly placed to an attorney, made on institutional telephones. Inmates received ample notice of this practice. First, they were advised of the practice at orientation lectures upon their arrival at MCC; Quintin attended such a lecture in March 1987. In addition, MCC posted above each telephone available to inmates a bilingual sign, the English version of which read:

### NOTICE

The Bureau of Prisons reserves the authority to monitor conversations on this telephone. Your use of institutional telephones constitutes consent to this monitoring. A properly placed telephone call to an attorney is not monitored.

In these circumstances the district court could properly find that Quintin impliedly consented to the monitoring and taping of his call to Willoughby. *See Amen*.

Finally, Quintin was given a form that stated as follows:

The Bureau of Prisons reserves the authority to monitor (this includes recording) conversations on any telephone located within its institutions, said monitoring to be done to preserve the security and orderly management of the institution and to protect the public. An inmate's use of institutional telephones constitutes consent to this monitoring.

Just above a line for the signature of the inmate, the form included the statement, "I understand that telephone calls I make from institution telephones may be monitored and recorded." Quintin signed the form on March 5, 1987. This sufficed to support a finding that Quintin expressly consented to the taping. We conclude that the court properly rejected Quintin's Title III contention.

The court also properly rejected the Title III arguments made on behalf of Willoughby. Whether or not Willoughby himself consented to the interception, the consent of Quintin alone, as a party to the conversation, sufficed to avoid the prohibitions of Title III. 18 U.S.C. § 2511(2)(c) (interception not prohibited when "one" of the parties to the communication has consented).

### 2. *The Fourth Amendment Arguments*

In *Amen*, we rejected a Fourth Amendment attack on the interception of telephone calls made by certain convicted prisoners, ruling that they had no reasonable expectation of privacy in their calls to nonattorneys on institutional telephones. 831 F.2d at 379–80. Quintin, Montgomery, and Willoughby, suggesting that pretrial detainees have greater privacy rights than do convicted inmates, claim that the interception of Quintin's telephone conversation with Willoughby therefore violated their Fourth Amendment rights. We find no merit in this claim.

Preliminarily, we note that defendants' brief merely asserts the principle that pretrial detainees have greater rights than convicted inmates, without ever stating that either Quintin or Montgomery in June 1987 was only a pretrial detainee and not a convicted prisoner. The government's brief on appeal states that neither Quintin nor Montgomery was simply a pretrial detainee, though they were awaiting trial on the robbery charges; rather, both had been convicted of state crimes and had been brought from state prisons to MCC for purposes of the robbery trial. Thus, the government argues that they were convicted prisoners to whom the *Amen* rule squarely applies. If the record before us clearly substantiated the government's factual premise, we would agree that *Amen* foreclosed the constitutional arguments. Unfortunately, the record is opaque. While revealing that Quintin had previously been convicted of attempted murder and that both he and Montgomery had been

brought to MCC from state prisons, the record does not exclude the possibility that Quintin had completed his prior sentence and that both he and Montgomery had been in state facilities as pretrial detainees on new charges.

Even if Quintin and Montgomery were merely pretrial detainees, however, the Fourth Amendment challenge to the interception of Quintin's telephone call to Willoughby must be rejected. Although pretrial detainees may have some residual privacy interests that are protected by the Fourth Amendment, *see United States v. Cohen*, 796 F.2d 20, 23–24 (2d Cir.1986), *cert. denied*, 479 U.S. 1055, 107 S.Ct. 932, 93 L.Ed.2d 982 (1987), the maintenance of prison security and the preservation of institutional order and discipline are "essential goals that may require limitation or retraction of the retained constitutional rights of both convicted prisoners and pretrial detainees." *Bell v. Wolfish*, 441 U.S. 520, 546, 99 S.Ct. 1861, 1878, 60 L.Ed.2d 447 (1979) (footnote omitted). The *Bell* Court noted that

> [t]here is no basis for concluding that pretrial detainees pose any lesser security risk than convicted inmates. Indeed, it may be that in certain circumstances they present a greater risk to jail security and order.... In the federal system, a detainee is committed to the detention facility only because no other less drastic means can reasonably assure his presence at trial.... As a result, those who are detained prior to trial may in many cases be individuals who are charged with serious crimes or who have prior records. They also may pose a greater risk of escape than convicted inmates.... This may be particularly true at facilities like the MCC, where the resident convicted inmates have been sentenced to only short terms of incarceration and many of the detainees face the possibility of lengthy imprisonment if convicted.

*Id.* at 546 n. 28, 99 S.Ct. at 1878 n. 28 (citations omitted). Given the difficulties inherent in prison administration, prison administrators are to be "accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Id.* at 547, 99 S.Ct. at 1878. Accordingly, whatever Fourth Amendment rights pretrial detainees retain have been held uninfringed by such security measures as strip and body-cavity searches, *see id.* at 558–60, 99 S.Ct. at 1884–85, and the monitoring of their conversations with visitors, *see Christman v. Skinner*, 468 F.2d 723, 726 (2d Cir.1972).

The telephone interception practices at MCC are among several security procedures (including for example, the search of handbags carried by visitors, the continuous surveillance of visiting rooms, and the random examination of nonattorney mail) in effect at that institution. The telephone taping system, which is triggered automatically by the lifting of the telephone's handset, is considered by prison officials to be an extremely effective tool in helping to maintain internal security. The recording system and the random live monitoring of telephone conversations have assisted, for example, in the detection of escape plans, of schemes to smuggle controlled substances into the facility, and of inmate identification of another inmate as an informant in the government's Witness Protection Program.

In all the circumstances, including the fact that inmates receive ample notice that such interceptions will occur, *see* Part II.A. 1. above, we conclude that MCC's practice of automatically taping and randomly monitoring telephone calls of inmates in the interest of institutional security is not an unreasonable invasion of the privacy rights of pretrial detainees.

■ Nor do we find merit in Willoughby's contention that his own privacy rights were entitled to greater protection than those of Quintin because he received Quintin's call in his home. Contacts between inmates and noninmates may justify otherwise impermissible intrusions into the noninmates' privacy. Thus, noninmate mail to prisoners may be subject to inspection, *see generally Procunier v. Martinez*, 416

U.S. 396, 408–09, 412–14, 94 S.Ct. 1800, 1808–09, 1810–12, 40 L.Ed.2d 224 (1974); and noninmate visitors may have their conversations with inmates monitored, *see United States v. Harrelson,* 754 F.2d 1153, 1169–70 (5th Cir.), *cert. denied,* 474 U.S. 908 & 1034, 106 S.Ct. 277 & 599, 88 L.Ed.2d 241 & 578 (1985), or be subject, based upon reasonable suspicion, to strip searches, *see Hunter v. Auger,* 672 F.2d 668, 673–75 (8th Cir.1982). With respect to telephone communications, the public is on notice pursuant to regulations published in 28 C.F.R. §§ 540.100 and 540.101 (1987) that prison officials are required to establish procedures for monitoring inmates' calls to noninmates. Given the institution's strong interest in preserving security, we conclude that the interception of calls from inmates to noninmates does not violate the privacy rights of the noninmates.

B. *The Quintin–Montgomery Conversation*

■ Quintin and Montgomery contend also that the recording of their conversation, following the conclusion of Quintin's call to Willoughby, violated their rights under Title III and the Fourth Amendment. We reject the Fourth Amendment argument essentially for the reasons discussed in Part II.A. above. We reject the Title III argument on somewhat different grounds.

Whereas the Quintin–Willoughby conversation was a telephone communication, the interception of which plainly was consented to by Quintin, the ensuing conversation between Quintin and Montgomery was not "made in whole or in part through the use of" telephone wires, *see* 18 U.S.C. § 2510(1) (defining "wire" communication). Rather, it was a face-to-face conversation adventitiously picked up by the recording system because Quintin was in the process of trying to make another telephone call at the time he was conversing with Montgomery. Since Title III also forbids the interception, without prior court authorization, of certain nonwire "oral" conversations, *see* 18 U.S.C. § 2511(1), we are skeptical of the government's contention that Quintin's consent to the interception of his telephone calls also constituted consent to the interception of his in-person conversation with Montgomery.

Rather, the basis for our rejection of the statutory challenge to the recording of the Quintin–Montgomery conversation is that the communication simply was not one of those protected by Title III. The statute defines an "oral" conversation, in pertinent part, as "any oral communication uttered by a person exhibiting an expectation that such communication is not subject to interception under circumstances justifying such expectation." 18 U.S.C. § 2510(2). Thus, to be an oral communication that is protected by Title III, the speaker must have had a subjective expectation that the communication was not subject to interception, and this expectation must have been objectively reasonable. *United States v. Harrelson,* 754 F.2d at 1169–70; *United States v. Pui Kan Lam,* 483 F.2d 1202, 1206 (2d Cir.1973), *cert. denied,* 415 U.S. 984, 94 S.Ct. 1578, 39 L.Ed.2d 881 (1974). We conclude that the requisite conditions were not met.

It is questionable whether Quintin and Montgomery had even a subjective belief that their conversation could not be overheard. The words of their conversation appeared to be deliberately cryptic, as was the telephone conversation with Willoughby. Thus, Quintin said to Montgomery afterwards, "I didn't want to mention the name on the phone or nothin' "; and so far as appears from the tape, Quintin similarly took care not to mention the name of the targeted person in his conversation with Montgomery.

Further, the conversation was conducted at one of the telephones available to inmates at MCC. These telephones were located in a multipurpose area which included dining tables, pool tables, and chairs. At the time of the conversation, there were some 35 people in the area, many of them milling around. Some four or five people were within 10 feet of the spot at which Quintin and Montgomery stood. Their conversation was thus conducted in a public area.

Finally, Quintin and Montgomery conversed while Quintin was in the process of using the telephone to make another call, and they knew the telephones were linked to a recording system. They had no basis for assuming that conversations next to an open telephone would not be overheard. "Mistaking the degree of intrusion of which probable eavesdroppers are capable is not at all the same thing as believing there are no eavesdroppers." *United States v. Harrelson*, 754 F.2d at 1170. We doubt that in all the circumstances Quintin and Montgomery had a subjective belief that they could not be overheard, and we conclude that even if they did have such a belief, the circumstances did not justify it. Accordingly, the conversation between Quintin and Montgomery was not an "oral" communication protected by Title III.

### C. Arthur's June 11 Conversation

■ Arthur contends that the taping of his June 11 conversation with Johnson violated his Fifth Amendment rights because he was not given *Miranda* warnings prior to conversing with Johnson. We disagree.

*Miranda* warnings are required prior to official interrogation of a person who "has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda v. Arizona*, 384 U.S. at 444, 86 S.Ct. at 1612 (footnote omitted). Although one who is imprisoned has in one obvious way been deprived of his freedom, and in *Mathis v. United States*, 391 U.S. 1, 4–5, 88 S.Ct. 1503, 1504–05, 20 L.Ed.2d 381 (1968), the Court held that *Miranda* warnings were required before agents of the Internal Revenue Service could question a prison inmate even on matters unrelated to those for which he was in prison, we believe that the mere fact of imprisonment does not mean that all of a prisoner's conversations are official interrogations that must be preceded by *Miranda* warnings. Rather, "[f]idelity to the doctrine announced in *Miranda* requires that it be enforced strictly, but only in those types of situations in which the concerns that powered the decision are implicated. Thus, we must decide whether a [given curtailment of freedom of action] exerts

upon a detained person pressures that sufficiently impair his free exercise of his privilege against self-incrimination to require that he be warned of his constitutional rights." *Berkemer v. McCarty*, 468 U.S. 420, 437, 104 S.Ct. 3138, 3149, 82 L.Ed.2d 317 (1984) (traffic stop, though it "significantly curtails the 'freedom of action' of the driver and the passengers," *id.* at 436, 104 S.Ct. at 3148, and is likely viewed by them as compelling continued presence until informed they may leave, *id.*, does not so compel a response to questions as to require *Miranda* warnings, *id.* at 437–40, 104 S.Ct. at 3148–50). Thus, a number of circuits have concluded that the fact of incarceration does not of itself make a prisoner's statements involuntary. *See, e.g., United States v. Conley*, 779 F.2d 970, 972–73 (4th Cir.1985), *cert. denied* 479 U.S. 830, 107 S.Ct. 114, 93 L.Ed.2d 61 (1986), *Flittie v. Solem*, 751 F.2d 967, 974 (8th Cir.1985), *cert. denied* 475 U.S. 1025, 106 S.Ct. 1223, 89 L.Ed.2d 333 (1986); *Cervantes v. Walker*, 589 F.2d 424, 427 (9th Cir.1978).

This Court has held that *Miranda* warnings were not required before a prison medical assistant, who during a routine physical examination observed a package fall from the pants of an inmate newly arrived at the institution, could ask "What is that?" *United States v. Morales*, 834 F.2d 35, 37–38 (2d Cir.1987). In *Conley*, the court ruled that an inmate's conversation with a prison guard on the way to the prison infirmary, initiated by the inmate's question "What's this all about?", was not inadmissible for lack of *Miranda* warnings. In *Flittie*, the court ruled that an inmate's statements to an informant visiting him in prison were not involuntary. While questioning the state's videotaping scheme, 751 F.2d at 974 n. 11, the court concluded as follows:

> While Flittie may have been constrained within the penitentiary walls, he was not forced to remain in the visitors' room with Harris. Thus, the imprisonment did not produce a coerced statement.
>
> ... Flittie agreed to see Harris of his free will, and he was equally free to

terminate the conversation at his pleasure. That the statement was secretly recorded does not itself vitiate the consent. . . .

*Id.* at 974–75.

In the present case, we see no error in the district court's finding that Arthur's conversation with Johnson was voluntary and thus did not require *Miranda* warnings. Though Arthur was indeed a prisoner, not free to leave MCC, there was nothing in the circumstances that suggested any measure of compulsion above and beyond that confinement. Arthur was not required to speak with Johnson. Indeed, Johnson had not sought to speak with Arthur; it was Arthur who had tried over a period of several weeks to reach Johnson, and Arthur who had requested that she visit him on June 11. Thus, the conversation was not initiated by the government. Further, Arthur could have terminated his conversation with Johnson at any time. Though he was not free to leave MCC, he was free to cut off a conversation with a visitor, and he must surely have felt free to do so with a visitor who was there only at his instance.

Accordingly, we conclude that there was no Fifth Amendment violation and that the district court properly declined to suppress the tape of Arthur's conversation with Johnson.

### D. *Admissibility of Evidence Regarding the 1982 Robbery*

The proof at the obstruction trial included testimony by White that on the day the Chemical branch was robbed, Arthur told her that he, Quintin, and Montgomery had just robbed the bank. In addition, several of Arthur's statements in the taped June 11 conversation with Johnson largely admitted that he and Quintin had participated in that robbery. Defendants contend that the trial court should have excluded so much of the tape of Arthur's conversation with Johnson as reflected the robbery and defendants' participation in it on the ground either that this constituted evidence of other crimes in violation of Fed.R.Evid. 404(b), or that the probative value of this evidence was outweighed by the prejudice to be caused by its admission, in violation of Fed.R.Evid. 403. We disagree.

While evidence of other crimes is inadmissible "to prove the character of a person in order to show action in conformity therewith," such evidence may be admitted to prove the motive with which other action was undertaken. Fed.R.Evid. 404(b). Thus, when a defendant has been charged with attempted or actual obstruction of justice with respect to a given crime, evidence of the underlying crime and the defendant's part in it is admissible to show the motive for his efforts to interfere with the judicial processes. *E.g., United States v. Bradwell,* 388 F.2d 619, 620–21 (2d Cir.), *cert. denied,* 383 U.S. 867, 89 S.Ct. 152, 21 L.Ed.2d 135 (1968); *United States v. Knohl,* 379 F.2d 427, 439 (2d Cir.), *cert. denied,* 389 U.S. 973, 88 S.Ct. 472, 19 L.Ed.2d 465 (1967).

In the present case, the evidence that Quintin, Arthur, and Montgomery had participated in the robbery was highly probative of their motive, and the intensity of that motive, to seek to prevent certain witnesses from testifying at their trial for robbery. Thus, Arthur told Johnson that defendants expected to be acquitted if the government could not present the testimony of "Ina and Pat." His view was that without that testimony, the government had no case. The evidence plainly was admissible under Rule 404(b), and the trial court did not abuse its discretion in concluding that its probative value outweighed any undue prejudice to defendants.

### E. *Sufficiency of the Evidence as to Montgomery*

Finally, Montgomery contends that his conviction of conspiracy to obstruct justice should be reversed because the government proved only that he was present during Quintin's telephone conversation with Willoughby and perhaps that he knew Quintin was seeking to obstruct justice, but that it failed to show that Montgomery was a member of the conspiracy to obstruct justice. This contention has no merit.

In challenging the sufficiency of the evidence to support his conviction, a defendant bears a heavy burden. *United States v. Losada,* 674 F.2d 167, 173 (2d Cir.), *cert. denied,* 457 U.S. 1125, 102 S.Ct. 2945, 73 L.Ed.2d 1341 (1982). In reviewing such a challenge, we must view the evidence in the light most favorable to the government, *Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed.2d 680 (1942), crediting every inference that could have been drawn in the government's favor, *United States v. Bagaric,* 706 F.2d 42, 64 (2d Cir.), *cert. denied,* 464 U.S. 840, 104 S.Ct. 134, 78 L.Ed.2d 128 (1983), and we must affirm the conviction so long as, from the inferences reasonably drawn, the jury might fairly have concluded guilt beyond a reasonable doubt. *United States v. Taylor,* 464 F.2d 240, 244–45 (2d Cir.1972). Montgomery has failed to sustain his burden.

Though it is established that participation in a conspiracy cannot be established merely by proof that the defendant was present and aware of the unlawful conduct of others, *e.g., United States v. Martino,* 759 F.2d 998, 1002 (2d Cir.1985); *United States v. Soto,* 716 F.2d 989, 991 (2d Cir.1983); *United States v. Johnson,* 513 F.2d 819, 823–24 (2d Cir.1975), the evidence regarding Montgomery easily established his active and knowing participation in the conspiracy. Thus, when Quintin telephoned Willoughby, Montgomery stood close beside him, and immediately after the call was concluded, Montgomery asked Quintin, "What's the plan?" Montgomery appeared to be upset at the role Willoughby was to play, saying, "You blew the whole plan." Quintin replied that they had no one else available to intimidate the witness and asked who Montgomery wanted to do it. Though at the end of this conversation, Quintin sought to reassure Montgomery that Willoughby knew "where to go" and "how to do it," the MCC official who observed this episode testified that the conversation ended with Montgomery stalking off in apparent anger. We conclude that the evidence was ample to permit a rational juror to find beyond a reasonable doubt that Montgomery shared the goals of the conspiracy to obstruct justice and was a knowing and active participant in it.

### CONCLUSION

The judgments of conviction are affirmed.