STATE OF CONNECTICUT *v.* TERRELL LEDBETTER
(13306)
(13407)

Foti, Schaller and Hull, Js.

Argued October 23, 1995—officially released May 21, 1996

*Helen L. Edmonds* and *Dina S. Wenger*, special public defenders, with whom, on the brief, was *Linda L. Morkan*, special public defender, for the appellant-appellee (defendant).

*James M. Ralls*, assistant state's attorney, with whom, on the brief, were *Michael Dearington*, state's attorney, and *Christopher Alexy*, assistant state's attorney, for the appellee-appellant (state).

HULL, J. The defendant, Terrell Ledbetter, was charged by an information with one count of robbery in the first degree in violation of General Statutes § 53a-134 (a) (3),[1] one count of larceny in the second degree in violation of General Statutes § 53a-123 (a) (3),[2] and one count of carrying a dangerous weapon

---

[1] General Statutes § 53a-134 (a) provides in relevant part: "A person is guilty of robbery in the first degree when, in the course of the commission of the crime of robbery as defined in section 53a-133 or of immediate flight therefrom, he or another participant in the crime . . . (3) uses or threatens the use of a dangerous instrument . . . ."

[2] General Statutes § 53a-123 (a) provides in relevant part: "A person is guilty of larceny in the second degree when he commits larceny as defined in section 53a-119 and . . . (3) the property, regardless of its nature or value, is taken from the person of another. . . ."

in violation of General Statutes § 53-206 (a).[3] In addition, he was charged with being a persistent felony offender in violation of General Statutes § 53a-40 (d).[4] The jury found the defendant guilty on the first three charges, and the court found him not guilty of being a persistent felony offender. The trial court imposed a sentence of twenty years incarceration, to be suspended after fifteen years, and three years of probation with special conditions.

The defendant appeals his convictions of robbery in the first degree, larceny in the second degree, and carrying a dangerous weapon. The state appeals the defendant's acquittal by the trial court of the persistent felony offender charge.[5] We affirm the judgment of the trial court on both the appeal and the cross appeal.

I

The defendant first claims that the state violated his constitutional privilege against self-incrimination under the fifth and fourteenth amendments to the United States constitution and article first, § 8, of the Connecticut constitution, by failing to advise him of his *Miranda* rights prior to his presentence interview.

---

[3] General Statutes § 53-206 (a) provides in relevant part: "Any person who carries upon his person . . . any knife the edged portion of the blade of which is four inches or over in length . . . unless such person has been granted a written permit issued and signed by the first selectman of a town, the mayor, chief of police of a city or the warden of a borough, authorizing such person to carry such weapon or instrument within such town, city or borough, shall be fined not more than five hundred dollars or imprisoned not more than three years or both. . . ."

[4] General Statutes § 53a-40 (d) provides: "A persistent felony offender is a person who (1) stands convicted of a felony other than a class D felony, and (2) has been, at separate times prior to the commission of the present felony, twice convicted of a felony other than a class D felony."

[5] The plaintiff and defendant brought separate appeals. The court consolidated the two appeals on April 15, 1994.

He claims that any statements he made at that time were involuntary and, therefore, inadmissible at his sentencing hearing. He claims that this renders the entire sentencing phase of his trial void as a matter of law. He asks that a new sentencing hearing be held. Because this claim is first raised on appeal, the defendant seeks review under *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989).

A constitutional claim not raised at trial may, under certain exceptional circumstances, be reviewed on appeal. Id. "[A] defendant can prevail on a claim of constitutional error not preserved at trial only if all of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt. In the absence of any one of these conditions, the defendant's claim will fail. The appellate tribunal is free, therefore, to respond to the defendant's claim by focusing on whichever condition is most relevant in the particular circumstances." Id. In the present case, we focus on whether the appellant has provided an adequate record for review.

"The defendant bears the responsibility for providing a record that is adequate for review of his claim of constitutional error. If the facts revealed by the record are insufficient, unclear or ambiguous as to whether a constitutional violation has occurred, we will not attempt to supplement or reconstruct the record, or to make factual determinations, in order to decide the defendant's claim." Id., 240. In order to determine whether the record is adequate for

review, we must consider the specific claim raised, and whether the record provided is adequate for meaningful review of that claim.

The defendant claims that he was not advised of his rights under *Miranda* v. *Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), prior to the presentence interview, in violation of his state and federal constitutional rights.[6] An individual is entitled to be advised of his *Miranda* rights prior to any "custodial interrogation" in order to protect his privilege against self-incrimination and to ensure that all confessions used against him are knowingly and voluntarily made. Id. Therefore, we must determine whether a custodial interrogation took place.

The definition of custody is not the same for every purpose. The United States Supreme Court has stated, for example, that "custody for purposes of *Miranda* has been more narrowly circumscribed" than, for instance, custody for purposes of federal habeas corpus. *Minnesota* v. *Murphy*, 465 U.S. 420, 430, 104 S. Ct. 1136, 79 L. Ed. 2d 409 (1983). "Although the circumstances of each case must certainly influence a determination of whether a suspect is in custody for purposes of receiving *Miranda* protection, the ultimate inquiry is simply whether there is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest. [*Oregon* v. *Mathiason*, 429 U.S. 492, 495, 97 S. Ct. 711, 50 L. Ed. 2d 714 (1977)]. *State* v. *Pittman*, [209 Conn. 596, 608, 553 A.2d 155 (1989)], quoting *California* v. *Beheler*, 463 U.S. 1121, 1125, 103 S. Ct. 3517, 77 L. Ed. 2d 1275 (1983). A person is in custody only if a reasonable person would have believed he was not free to leave.

---

[6] "*Miranda* warnings are independently required under article first, § 8, of the Connecticut constitution to the same extent that they are required under the federal constitution." *State* v. *Williams*, 227 Conn. 101, 115, 629 A.2d 402 (1993), citing *State* v. *Barrett*, 205 Conn. 437, 447, 534 A.2d 219 (1987).

*State* v. *Hoeplinger*, [206 Conn. 278, 286–87, 537 A.2d 1010 (1988)]. We must look at the totality of the circumstances of the questioning in order to determine whether a reasonable person would have construed those circumstances as placing him in a custody situation. Id., 287." (Internal quotation marks omitted.) *State* v. *Rasmussen*, 225 Conn. 55, 76, 621 A.2d 728 (1993).

"[T]he *Miranda* safeguards were designed to vest a suspect in custody with an added measure of protection against *coercive* police practices . . . ." (Emphasis added.) *Rhode Island* v. *Innis*, 446 U.S. 291, 301, 100 S. Ct. 1682, 64 L. Ed. 2d 297 (1980). However, "the definition of interrogation [for purposes of *Miranda*] can extend only to words or actions on the part of police officers that they *should have known* were reasonably likely to elicit an incriminating response." (Emphasis in original.) Id., 301–302. Interrogation must also "reflect a measure of compulsion above and beyond that inherent in custody itself." Id., 300. " '[W]e must decide whether a [given curtailment of freedom of action] exerts upon a detained person pressures that sufficiently impair his free exercise of his privilege against self-incrimination to require that he be warned of his constitutional rights.' " *United States* v. *Willoughby*, 860 F.2d 15, 23 (2d Cir. 1988), quoting *Berkemer* v. *McCarty*, 468 U.S. 420, 437, 104 S. Ct. 3138, 82 L. Ed. 2d 317 (1984).

It is undisputed that the defendant in this case was incarcerated at the time of the presentence interview. "Although one who is imprisoned has in one obvious way been deprived of his freedom . . . the mere fact of imprisonment does not mean that all of a prisoner's conversations are official interrogations that must be preceded by *Miranda* warnings. Rather, [f]idelity to the doctrine announced in *Miranda* requires that it be enforced strictly, but only in those types of situations in which the concerns that powered the decision are implicated." (Citation omitted; internal quotation marks

omitted.) *United States* v. *Willoughby*, supra, 860 F.2d 23.

"Custodial arrest is said to convey to the suspect a message that he has no choice but to submit to the officers' will and to confess. *Miranda* v. *Arizona*, [supra, 384 U.S. 456–57]. . . . Moreover, custodial arrest thrusts an individual into 'an unfamiliar atmosphere' or 'an interrogation environment . . . created for no purpose other than to subjugate the individual to the will of his examiner.' Id., [457]. Many of the psychological ploys discussed in *Miranda* capitalize on the suspect's unfamiliarity with the officers and the environment. . . . Finally, the coercion inherent in custodial interrogation derives in large measure from an interrogator's insinuations that the interrogation will continue until a confession is obtained. Id., [468]. Since [the defendant] was not physically restrained and could have left the office, any compulsion he might have felt from the possibility that terminating the meeting would have led to revocation of probation was not comparable to the pressure on a suspect who is painfully aware that he literally cannot escape a persistent custodial interrogator." *Minnesota* v. *Murphy*, supra, 465 U.S. 433.

"[A] number of circuits have concluded that the fact of incarceration does not of itself make a prisoner's statements involuntary. See, e.g., *United States* v. *Conley*, 779 F.2d 970, 972–73 (4th Cir. 1985), cert. denied, 479 U.S. 830, 107 S. Ct. 114, 93 L. Ed. 2d 61 (1986); *Flittie* v. *Solem*, 751 F.2d 967, 974 (8th Cir. 1985), cert. denied, 475 U.S. 1025, 106 S. Ct. 1223, 89 L. Ed. 2d 333 (1986); *Cervantes* v. *Walker*, 589 F.2d 424, 427 (9th Cir. 1978)." *United States* v. *Willoughby*, supra, 860 F.2d 23. In *Willoughby*, the Second Circuit stated: "[The defendant's] conversation with [the informant] was voluntary and thus did not require *Miranda* warnings. Though [the defendant] was indeed a prisoner, not free

to leave [the prison], there was nothing in the circumstances that suggested any measure of compulsion above and beyond that confinement." Id., 24.

Similarly, in *Flittie* v. *Solem,* supra, 751 F.2d 974, the Eighth Circuit held that an inmate's recorded statements to an informant during a prison visit were not involuntary. The court stated: "While Flittie may have been constrained within the penitentiary walls, he was not forced to remain in the visitors' room with [the informant]. Thus the imprisonment did not produce a coerced statement." Id., 974 n.11. The fact that he was free to terminate the conversation "at his pleasure" was a factor in determining whether the statements were coerced. Id., 974–75. In *United States* v. *Willoughby,* supra, 860 F.2d 24, the court stated: "Though [the defendant] was not free to leave [the prison], he was free to cut off a conversation with a visitor . . . ." Therefore, despite the fact that the statements were secretly recorded, the statements did not require *Miranda* warnings. Id.

In the present case, the only information in the record as to whether the defendant was "in custody" for purposes of *Miranda* at the time of the presentence interview is that the defendant was incarcerated. The record is totally silent as to the circumstances under which the presentence interview was conducted. We can not determine from the record before us whether *any* questioning occurred, let alone any questioning likely to "elicit an incriminating response" or to make the defendant feel coerced, and therefore constituting an interrogation. For all this court can tell from the record, the defendant may not have been asked a single question at the presentence interview and may have been informed that he could leave at any time.

We conclude that the fact of incarceration alone is not sufficient to establish that a "custodial interrogation" occurred. The defendant has failed to provide an ade-

quate record for this court to determine the issue sought to be raised under *Golding,* and has therefore failed to satisfy the first prong of *Golding.* The defendant is not entitled to review of this claim.

## II

The defendant next claims that the trial court should not have admitted the testimony of Officer Gerald Antunes of the New Haven police department. The defendant claims that the testimony was inadmissible because it did not qualify either as a prior consistent statement or as a business record, and did not satisfy the best evidence rule. We need not consider those issues, however, because we conclude that the defendant has failed to demonstrate that the admission of the testimony at issue was harmful to him. He, therefore, cannot prevail on this claim.

"It is a fundamental rule of appellate review of evidentiary rulings that if error is not of constitutional dimensions, an appellant has the burden of establishing that there has been an erroneous ruling which was probably harmful to him. *State* v. *Vitale,* 197 Conn. 396, 403, 497 A.2d 956 (1985). The question is whether the claimed erroneous action of the trial court is likely to have affected the result of the trial. *State* v. *Brown,* 199 Conn. 14, 25, 505 A.2d 690 (1986); *State* v. *Gonzales,* 196 Conn. 115, 119, 491 A.2d 1067 (1985). *State* v. *Torrice,* 20 Conn. App. 75, 91, 564 A.2d 330, cert. denied, 213 Conn. 809, 568 A.2d 794 (1989). . . . [O]ur inquiry focuses on the impact of the improperly introduced evidence on the jurors' perceptions and understanding of the other evidence presented in the case, rather than an analysis of the sufficiency of the remaining evidence to uphold the conviction in the absence of the admission of the [allegedly improperly admitted] evidence . . . . See *Swenson* v. *Sawoska,* 215 Conn. 148, 152–53, 575 A.2d 206 (1990)." (Internal quotation marks omitted.) *State*

v. *Merritt*, 36 Conn. App. 76, 92, 647 A.2d 1021 (1994), appeal dismissed, 233 Conn. 302, 659 A.2d 706 (1995) (certification improvidently granted). Erroneously admitted evidence is not grounds for reversal if the court "cannot conclude . . . that the jury's perceptions of the other evidence presented in this case . . . were so affected by the improperly admitted testimony . . . that it is likely that the result of the trial would have been different in the absence of [that evidence]." Id., 93.

The defendant claims that the admission of Antunes' testimony "harmed the defendant both by the admission of facts that were not established by any other evidence, and by adding credibility to [the victim's] testimony." He also claims that the admission of the statements regarding a search for the perpetrator was harmful because the court "specifically found that these facts were relevant to the issues of flight and consciousness of guilt, which the state discussed in its closing argument, and on which the court instructed the jury at the close of evidence." The defendant claims that this testimony was the only evidence of consciousness of guilt presented. We find that even if the admission of this testimony was erroneous, we cannot say that it is likely to have affected the result of the trial or that it was probably harmful to the defendant.

The following facts are relevant to this issue. At trial, Antunes testified to his duty as keeper of the records for the police department and to the type of record that is made when a complaint is received. He also testified that a complaint was received from the alleged victim in this matter at 12:24 a.m. on the evening of the alleged robbery. On the basis of the police dispatch cards, Antunes testified as to the complaint received from the victim and the response of the police department to the complaint. He also testified that the complainant reported a robbery at Wintergreen and Farnham Ave-

nues at approximately 12:24 a.m. on the date in question. He further testified that three officers were dispatched to the area approximately one-half hour later. Antunes also testified that the officers reported at approximately 4:07 a.m. that they were "going to this particular search" for the alleged perpetrator, who was not named, in the area of Rockville Circle. Antunes testified that the search lasted until approximately 4:23 a.m., and that it was unsuccessful.

The defendant claims that Antunes' testimony "bolstered" the victim's testimony that he reported a robbery on the date in question. It is obvious, however, even without the testimony that the victim reported that a robbery had occurred because, had no report been made, there would be no case before this court. Therefore, even if the testimony was erroneously admitted, we cannot say that Antunes' testimony that the victim reported a robbery on the date in question "probably impacted the jurors' perceptions and understanding of the other evidence presented by the state" or that it was "probably harmful" to the defendant.

The defendant next claims that if Antunes' testimony had not been admitted, the only admitted evidence directly linking the defendant to the crimes charged would have been the victim's testimony. Antunes, however, did not identify the defendant as the perpetrator in his testimony. His testimony, therefore did not directly link the defendant to the crimes charged, and the victim's testimony remains the only testimony directly linking the defendant to the crimes. Therefore, we cannot say that Antunes' testimony "probably impacted the jurors' perceptions and understanding of the other evidence presented by the state" relating to whether the defendant was the perpetrator, or that it was "probably harmful" to the defendant.

The defendant also claims that Antunes' testimony was the sole source of information that police searched

for the defendant at Rock View Circle and failed to find him. Antunes did not testify, however, that the police searched for *the defendant* on the morning of November 4, 1991. He testified only that the police conducted a search of the area in question some time after the alleged incident, and that the search was not successful. The defendant was not identified as the object of the search. We cannot say that Antunes' testimony in this regard "probably impacted the jurors' perceptions and understanding of the other evidence presented by the state" or that it was "probably harmful" to the defendant.

The defendant further claims that the testimony relating to an unsuccessful search was harmful to the defendant because the court specifically found the facts relating to an unsuccessful search relevant to issues of flight and consciousness of guilt, which the state discussed in its closing argument and on which the court instructed the jury at the close of evidence. Contrary to the defendant's claim, however, the testimony of Antunes regarding the unsuccessful search was not the only evidence of the defendant's flight and consciousness of guilt. The victim testified that after the robbery on the date in question, "[The defendant] vanished. He was gone . . . . Yes, he ran. He vanished." When subsequently asked whether he ever saw the defendant again after the date in question, the victim testified: "I saw him a couple times, but he was ducking. He knows my car. He knows the car anyway. He was ducking. I saw him in West Haven and I saw him in New Haven a couple times." In light of this testimony regarding flight and consciousness of guilt, Antunes' is not the sole testimony regarding these issues. Further, the search did not occur until some time after the alleged robbery. Therefore, the fact that no perpetrator was found at that time does not appear to be critical to the issues of flight and consciousness of guilt. We

cannot say that Antunes' testimony in this regard "probably impacted the jurors' perceptions and understanding of the other evidence presented by the state" or that it "probably harmed" the defendant.

The defendant also argues that the record reflects that the jury actually considered Antunes' testimony in reaching its verdict. In his brief, the defendant claims that "[d]uring its deliberations, the jury specifically asked to see the police report filed by J. Douglas. The court responded to the jury that '[t]here was a reference to a report by Lieutenant Antunes, but that was not introduced as a full exhibit.' This exchange between the jury and the court indicates that the officer's testimony likely played a key role in the jury's deliberations."

The court's response to the jury's request made it clear to the jury that the police report was not an exhibit, and the police report was not provided to the jury. Thus, the jury was correctly advised as to the proper status of the police report, and the record provides no indication that the jury subsequently improperly considered either the report in question or any testimony relating to it. Further, the only information provided by Antunes' testimony was that previously discussed, with respect to which we cannot say that the testimony "probably impacted the jurors' perceptions and understanding of the other evidence presented by the state" or that it "probably harmed" the defendant. We cannot say that in the absence of any of the challenged evidence, it is likely that the result of the trial would have been different. Therefore, the defendant cannot prevail on this issue.

### III

In its cross appeal, the state raises the issue of whether the persistent felony offender provision of

§ 53a-40 (d) requires that commission of the second offense occur after conviction and sentencing on the first offense.

The defendant was convicted of attempted kidnapping in the second degree and sexual assault in the first degree. As the trial court stated in its memorandum of decision: "Each charge emanated from a separate incident committed against different victims on different dates and was the subject of a separate information. However, the defendant pleaded guilty to the two charges at the same time. Subsequently . . . the defendant was sentenced to concurrent terms of imprisonment of six years for each of these offenses at the same disposition proceeding." On the basis of those convictions, the defendant was charged with being a persistent felony offender. The trial court found the defendant not guilty of that charge.

General Statutes § 53a-40 (d) provides: "A persistent felony offender is a person who (1) stands convicted of a felony other than a class D felony, and (2) has been, *at separate times* prior to the commission of the present felony, *twice convicted* of a felony other than a class D felony." (Emphasis added.) Thus, the persistent felony offender statute, on its face, requires that the defendant have been convicted of the predicate offenses *at separate times*. The state argues that "it appears the [Commission to Revise the Criminal Statutes] in adopting the 'at separate times' language, merely intended to follow the New York and Model Penal Code requirement that the first and second offense stem from separate transactions."

"As is true in every case involving the construction of a statute, our starting point must be the language employed by the legislature." *Verdon* v. *Transamerica Ins. Co.*, 187 Conn. 363, 366, 446 A.2d 3 (1982). "[W]ell defined principles of statutory interpretation . . .

require us to ascertain and give effect to the apparent intent of the legislature. . . . If the language of a statute is plain and unambiguous, we need not look beyond the statute because we assume that the language expresses the intention of the legislature." (Citations omitted.) *State* v. *Blasko*, 202 Conn. 541, 553, 522 A.2d 753 (1987). The words used by the legislature in a statute must be given their ordinary meaning and must be construed with common sense. *State* v. *Roque*, 190 Conn. 143, 151, 460 A.2d 26 (1983).

Moreover, "[c]riminal statutes are not to be read more broadly than their language plainly requires and ambiguities are ordinarily to be resolved in favor of the defendant." *State* v. *McGann*, 199 Conn. 163, 177, 506 A.2d 109 (1986). "A penal statute must be construed strictly against the state and liberally in favor of the accused." *State* v. *Torres*, 206 Conn. 346, 355, 538 A.2d 185 (1988). "It is a fundamental tenet of our law to resolve doubts in the enforcement of a penal code against the imposition of a harsher punishment. . . . We must construe statutory language strictly to avoid imposing criminal liability where none is expressly intended by the legislature." (Citation omitted; internal quotation marks omitted.) *State* v. *Jacobson*, 31 Conn. App. 797, 802, 627 A.2d 474 (1993). " 'When a[n] . . . unforesecable state-court construction of a criminal statute is applied retroactively to subject a person to criminal liability for past conduct, the effect is to deprive him of due process of law in the sense of fair warning that his contemplated conduct constitutes a crime.' *Bouie* v. *Columbia*, 378 U.S. 347, 354–55, 84 S. Ct. 1697, 12 L. Ed. 2d 894 (1964) . . . ." (Citation omitted.) *State* v. *McGann*, supra, 177.

Our Supreme Court has not addressed the meaning of the phrase "at separate times . . . twice convicted" in § 53a-40 (d). The Maryland Court of Special Appeals, however, in reviewing Maryland's mandatory sentencing provision, considered the meaning of the phrase

" 'convicted *on two separate occasions* of a crime of violence where the convictions did not arise from a single incident . . . .' " (Emphasis added.) *Lett* v. *State,* 51 Md. App. 668, 677, 445 A.2d 1050 (1982). In doing so, that court held that "the term 'two separate occasions' has a plain meaning and is not fairly susceptible of an interpretation other than that of two unconnected, distinct, or unique times." Id., 679. We conclude that the language "has been, at separate times . . . twice convicted" in § 53a-40 (d) likewise cannot mean anything other than conviction at "two unconnected, distinct, or unique times." Id. This defendant's convictions were indisputably rendered on a single occasion.

We conclude that in the present case the defendant's prior convictions were not rendered "at separate times."

The judgment is affirmed.

In this opinion FOTI, J., concurred.

SCHALLER, J. dissenting. I agree with parts I and II of the majority decision. I disagree, however, with part III, in which the majority holds that the persistent felony offender provision of General Statutes § 53a-40 (d) requires that the convictions of prior felonies must have occurred at separate times from each other even when the convictions arose out of entirely distinct incidents that occurred at separate times.

It is important to emphasize what is involved in this case. As the trial court indicated: "Each [prior conviction] emanated from a separate incident committed against different victims on different dates and was the subject of a separate information." By virtue of the fortuities of the scheduling process, the defendant pleaded guilty to the two crimes on the same day and received concurrent sentences. My analysis of § 53a-40

(d) leads me to conclude that persistent felony offender status arises when the first two felonies were committed at separate times, that is, arose out of separate incidents. This position is consistent with a reasonable interpretation of the statutory language, and is supported by the reasoning of our Supreme Court in *State v. Clemons*, 168 Conn. 395, 408–409, 363 A.2d 33, cert. denied, 423 U.S. 855, 96 S. Ct. 104, 46 L. Ed. 2d 80 (1975), and *State v. Dolphin*, 203 Conn. 506, 523, 525 A.2d 509 (1987).

My disagreement is based on fundamental principles of statutory interpretation. " '[O]ur fundamental objective is to ascertain and give effect to the apparent intent of the legislature.' " *State v. Burns*, 236 Conn. 18, 22, 670 A.2d 851 (1996), quoting *State v. Spears*, 234 Conn. 78, 86–87, 662 A.2d 80 (1995). " 'It is axiomatic that, where the statutory language is clear and unambiguous, construction of the statute by reference to its history and purpose is unnecessary. *Winslow v. Lewis-Shepard, Inc.*, 216 Conn. 533, 538, 582 A.2d 1184 (1990). That axiom applies in full force, however, only "[w]here . . . the language of a statute is . . . *absolutely* clear" on its face and where no ambiguity is raised in applying the statute in a particular case. . . . *Anderson v. Ludgin*, 175 Conn. 545, 554, 400 A.2d 712 (1978) . . . .' " (Citation omitted; emphasis in original.) *Rose v. Freedom of Information Commission*, 221 Conn. 217, 225, 602 A.2d 1019 (1992).

I disagree with the majority—but agree with the trial court—that the language of § 53a-40 (d) is ambiguous.[1]

---

[1] The trial court stated that "most jurisdictions that have determined the issue of chronology of convictions have resorted to statutory construction, the legislative history of the statute and the case law of other jurisdictions with other similar provisions. . . . However, the most decisive factor appears to be the courts' determination of the purpose behind their persistent felony offender provisions." Thus, while the trial court did not expressly state that it found § 53a-40 (d) ambiguous, it clearly resorted to tools of statutory construction beyond the language of the statute.

I note initially that the language of the statute can be read in a variety of ways. A literal reading appears to require the conviction of two felonies ("twice convicted") at more than one time ("at separate times").[2] Could the legislature have intended a minimum of four prior convictions before persistent felony status attached? Aside from that literal reading, it is unclear whether the language "at separate times" creates a time differential between the two prior convictions or merely a time differential between the present conviction and both prior convictions. Common sense and logic suggest that the legislature would have anticipated that, under normal circumstances, prior convictions involving separate incidents would occur on separate dates. On the basis of that premise, the legislature logically adopted the present language to cover such a situation.

Moreover, this is a situation in which "application of the statute . . . reveals a latent ambiguity in seemingly unambiguous language"; *Rose* v. *Freedom of Information Commission,* supra, 221 Conn. 227; because it creates "unworkable results." *State* v. *Cain,* 223 Conn. 731, 744, 613 A.2d 804 (1992). Our Supreme Court stated that "even if a statute is considered clear on its face if a literal interpretation of that statute would lead to unworkable results, resort to other aids to determine legislative intent is appropriate." Id., 744. The result reached by the majority in the present case is clearly unworkable. Persistent felony offender status would hinge on the fortuities and uncertainties of the criminal plea and sentencing process—not to mention being subject to potential manipulations by participants in the process. A defendant who was convicted on different days of two offenses that arose out of a single incident

---

[2] Section 53a-40 (d) provides that in order to be punished as a persistent felony offender, the defendant must have been *"at separate times* prior to the commission of the present felony, *twice convicted* of a felony other than a class D felony." (Emphasis added.)

could be charged as a persistent felony offender. On the other hand, a defendant in the present situation could not be so charged. I cannot believe that the legislature contemplated such an unpredictable and absurd result.

The majority cites a Maryland Court of Appeals decision, *Lett* v. *State*, 51 Md. App. 668, 677–80, 445 A.2d 1050 (1982), in support of its conclusion that § 53a-40 (d) is unambiguous and has a plain meaning. That case is distinguishable, however, because the Maryland court applied a different standard of statutory construction.[3] That court was bound by an earlier Maryland decision in which it was held that, even though the persistent felony offender statute before it was " 'neither sensible nor reasonable and manifestly leads to an absurdity,' " the court was " 'not at liberty to depart from' " a strict construction of the statute. Id., 678. Under the strict rules of statutory construction in Maryland, therefore, it could not render a common sense interpretation.

Fortunately, we are not so constrained. The law of our state permits us to look further in order to ascertain the legislative meaning where unartful statutory language creates an inherent ambiguity. *State* v. *Cain*, supra, 223 Conn. 744; *Rose* v. *Freedom of Information Commission*, supra, 221 Conn. 227. In *People* v. *Preuss*, 436 Mich. 714, 461 N.W.2d 703 (1990), the Supreme Court of Michigan was also not so constrained. In interpreting Michigan's fourth time habitual offender statute, Michigan Compiled Laws § 769.12, the court "recogniz[ed] the well-established principle that a literal reading of a statute may be modified if that reading leads to a clear or manifest contradiction of the apparent

---

[3] Article 27, § 643B (c), of the Michigan Compiled Laws provides in pertinent part: "Any person who (1) has been convicted on two separate occasions of a crime of violence where the convictions do not arise from a single incident" may be sentenced as a persistent felony offender.

purpose of the act, or if necessary to correct an absurd and unjust result . . . ." *People* v. *Preuss*, supra, 721. After examining the statute's legislative history, purpose and cases from other jurisdictions,[4] the court concluded: "The statute requires only that the fourth offense be preceded by three convictions of felony offenses, and that each of those three predicate felonies arise from separate criminal incidents." Id., 717.[5]

I now undertake a similar examination of § 53a-40 (d). Unfortunately, the legislative history provides minimal illumination. Whereas the trial court found support in the legislative history to formulate a theory that the statute has a rehabilitative purpose, I conclude that the legislative history suggests a *punitive* purpose for the statute.[6] Because the legislative history is essentially

[4] The court specifically cited holdings from Hawaii, Nevada, and every United States Court of Appeals. *People* v. *Preuss*, supra, 436 Mich. 735.

[5] In examining this issue, the Supreme Court of Michigan evaluated both its existing law and its predecessor statute. *People* v. *Preuss*, supra, 436 Mich. 721. Michigan's existing law, § 769.12, provides in pertinent part: "If a person has been convicted of 3 or more felonies, attempts to commit felonies, or both . . . and that person commits a subsequent felony within this state, the person shall be punished upon conviction as follows . . . ." "Before that, the language was somewhat different: 'A person who after having been 3 times convicted . . . of felonies or attempts to commit felonies . . . commits any felony within this state . . . may be sentenced upon conviction of such fourth or subsequent offense to . . . . [1949 P.A. 56; 1929 P.A. 24; 1927 P.A. 175.]" *People* v. *Preuss*, supra, 720–21. The court continued: "While the original language of the statute clearly requires that the fourth offense be committed after the three prior convictions, and the present language probably requires the same, neither contains any requirement that a fourth offender's three prior offenses, convictions, or sentences occur in any particular sequence." Id., 721.

[6] In responding to a question of the effect of No. 80-422 of the 1980 Public Acts, Representative Alfred Onorato stated: "Well, it seems what it would do is lock somebody up on the third offense if it is a felony." Conn. Joint Standing Committee Hearings, Judiciary, Pt. 6, 1980 Sess., p. 1148. In addition, Chief State's Attorney Austin McGuigan stated that the "persistent felony offender statute . . . recognizes the need that some people, who are committing violent predatory street crimes, must be incarcerated for the streets to be safe." Conn. Joint Standing Committee Hearings, Judiciary, Pt. 5, 1980 Sess., p. 1161. I conclude that the trial court's theory that the statute

inconclusive, however, we must turn to other methods of statutory construction.

In ascertaining the legislative purpose, my analysis differs from that of the majority and the trial court concerning the purpose of the statute and the degree of strictness with which the statute should be read. First, our Supreme Court's decision in *State* v. *Clemons*, supra, 168 Conn. 395, while not directly on point, is analogous to the present situation. In that case, which involved a prior statute, General Statutes (Rev. to 1969) § 54-121, our Supreme Court rejected a defendant's claim that because he was given concurrent sentences on two convictions, one in 1966 and one in 1968, he could not be found to have been twice sentenced. *State* v. *Clemons*, supra, 408–409. The court held that they clearly were "separate judgments" and "separate terms of imprisonment" because, even if one could be modified, the defendant still would have to serve the entirety of the other. Id., 407–408. That reasoning, whereby the court rejected the idea that third offenders must have two separate chances to reform, is highly persuasive here. Id., 407–409.

Second, both the majority and the trial court rely on the rule of lenity in order to bolster their interpretations. The rule of lenity seems oddly out of place in this situation, however, in view of our Supreme Court's decision in *State* v. *Dolphin*, supra, 203 Conn. 506, in which the court made it clear that General Statutes (Rev. to 1987) § 53a-40 (a)[7] is designed to provide increased

---

has exclusively a rehabilitative purpose excludes "other penal goals such as taking repeat offenders off the streets for especially long periods, or simply visiting society's retribution upon repeat offenders more severely." *Deal* v. *United States*, 508 U.S. 129, 136, 113 S. Ct. 1993, 124 L. Ed. 2d 44 (1993).

[7] General Statutes (Rev. to 1987) § 53a-40 (a) provides: "A persistent dangerous felony offender is a person who (1) stands convicted of manslaughter, arson, kidnapping, sexual assault in the first or third degree, sexual assault in the first or third degree with a firearm, robbery in the first or second degree, or assault in the first degree; and (2) has been, prior to the commis-

punishment. The court stated that "it is clear that the purpose of this statute is to provide increased punishment for those who have committed dangerous felonies and have been deemed dangerous to society, regardless of the date of conviction and imprisonment." Id., 523. The court, therefore, rejected the defendant's argument that because § 53a-40 is a penal statute, any ambiguity should be resolved in favor of lenity, preferring instead to apply the "presumption that the legislature intends to accomplish a reasonable and rational result rather than a ' "difficult and possibly bizarre" ' one." Id., 524, quoting *State* v. *Blasko*, 202 Conn. 541, 558, 522 A.2d 753 (1987).[8]

*Clemons* and *Dolphin* lead me to conclude that neither the rule of lenity nor any claimed rehabilitative purpose can serve as an appropriate basis for an interpretation of § 53a-40 (d). Without support for the trial

sion of the present crime, convicted of and imprisoned, under a sentence to a term of imprisonment of more than one year or of death, in this state or in any other state or in a federal correctional institution for any of the following crimes: (A) The crimes enumerated in subdivision (1), the crime of murder, or an attempt to commit any of said crimes or murder; or (B) prior to October 1, 1975, any of the crimes enumerated in section 53a-72, 53a-75 or 53a-78 of the general statutes, revision of 1958, revised to 1975, or prior to October 1, 1971, in this state, assault with intent to kill under section 54-117, or any of the crimes enumerated in sections 53-9, 53-10, 53-11, 53-12 to 53-16, inclusive, 53-19, 53-21, 53-69, 53-78 to 53-80, inclusive, 53-82, 53-83, 53-86, 53-238 and 53-239 of the general statutes, revision of 1958, revised to 1968, or any predecessor statutes in this state, or an attempt to commit any of said crimes; or (C) in any other state, any crimes the essential elements of which are substantially the same as any of the crimes enumerated in subdivision (1) or (2)."

[8] The court specifically found that: "It would be anomalous to have one person found guilty of being a persistent dangerous felony offender because he committed the crime of assault with intent to kill, was convicted and imprisoned prior to October 1, 1971, while another person, who committed the same crime on the same day, not be considered a persistent dangerous felony offender because, by mere happenstance, he was not convicted and imprisoned until after October 1, 1971. Such a result would undermine the legislative intent of § 53a-40 and would frustrate the purpose of the persistent dangerous felony offender statute." *State* v. *Dolphin*, supra, 203 Conn. 524.

court's theory that rehabilitation is the primary purpose of this statute, there is no basis whatever on which to conclude that the first two convictions must be rendered on separate occasions. It would be anomalous to have one person found guilty of being a persistent felony offender because he committed two felonies in separate incidents and was convicted on separate occasions, while another person, who also committed two felonies in separate incidents, not be considered a persistent felony offender because, by mere happenstance, he was convicted of both felonies on one occasion. Compare *State* v. *Dolphin*, supra, 203 Conn. 524.

The only sensible way of reading the statute is to interpret it as requiring that the first two convictions arise out of separate criminal incidents, as they did here. That interpretation fulfills the punitive purpose that appears in the legislative history and that was underscored by our Supreme Court in *Dolphin*. "In construing a statute, common sense must be used, and courts will assume that the legislature intended to accomplish a reasonable and rational result." (Internal quotation marks omitted.) *State* v. *Guckian*, 226 Conn. 191, 201, 627 A.2d 407 (1993), quoting *Warkentin* v. *Burns*, 223 Conn. 14, 20, 610 A.2d 1287 (1992).

Accordingly, I would reverse the judgment of acquittal on the persistent felony count and remand for a new trial on that count alone.

For all the foregoing reasons, I respectfully dissent.